# T. Laurence Huffman, M.D.

Board Certified Emergency Medicine ■ Board Certified Family Medicine ■ CAQ Geriartics

Date: 3-11-22

To: Daniel Flaherty
Paul Gallardo
PO Box 1968
Great Falls MT 59403

From: T. Laurence Huffman M.D.
15 Dalton Circle
Branson MO 65616

Concerning: Willy Pepion

At your request I have reviewed the supplied medical and other records of Willie Pepion. These include the following medical, court, and video records:
1. A series of Court Documents
   a. Complaints of Plaintiff and Defendants
   b. Answers to Complaint by Plaintiff and Defendants
   c. Preliminary Pre-Trial Statements by Plaintiff and Defendants
   d. Initial Disclosures of Plaintiff and Defendants
   e. Interrogatories
   f. First Discovery Request by Plaintiff and Defendants
   g. Responses to First Discovery Request by Plaintiff and Defendants
   h. Second Discovery Request by Defendants
   i. Scheduling Order
   j. Protective Order
   k. Multiple documents related to appointment of a Personal Representative
2. Letters and News Media articles concerning the events of this case
3. Medical records from EMS, Browning MT Hospital Emergency Department (ED) records Jose Ortiz MD and Michael Furniss RN, Autopsy and Death Certificate of Willy Pepion
4. Investigative Report of Deputy David Spotted Eagle

The medical records I have reviewed based on the Standards of Care (SOC) that existed in Montana, Missouri and other states throughout the United States during the time period of 2020 for the treatment of an agitated, mental status altered patient with head and shoulder injuries and with a clinical situation that was described in the above medical and other records. Any opinions expressed are based on reasonable medical probability, that is to say, more likely to have occurred than to not have occurred. I am currently Board Certified in Emergency Medicine. I am also Board Certified in Family Medicine with special added qualifications in Geriatrics (commonly spoken of as being Board Certified in Geriatrics). My opinions are based on the principles of evidence-based medicine and science, the scientific and medical literature concerning these matters, and my training, skill, and experience from my practice of medicine beginning in 1972, I have attached my most recent CV.

4726 SW Gull Point Trail, Lee's Summit, MO, 64082 ■ Email-TL@huffmanmd.net

With regard to my current medical activities, during the period of 2020, I have practice in both EDs and medical clinics, been deployed as an Emergency Care Physician for the Missouri Disaster Assistance Team. I serve on the Stone County Emergency Response 911 Board of Directors as Secretary/Treasurer. In the past, I have served as the Jail Physician for several Correction Facilities in the State of Missouri, and while working in various EDs have frequently managed medical clearance for individuals detained by Law Enforcement. I have also been the medical director for a number of years of Child Advocacy Centers, mostly Lake Area Child Advocacy Center. I have been both a SAFE and a SANE provider for the State of Missouri. Thus, I feel I am familiar with the Standards of Care as they relate to patients that present with conditions and diseases such as was the case with patient Willy Pepion. The Standards of Care (SOC) for treating patients by Emergency Medicine physicians are similar or identical in Montana, Missouri and throughout the United States.

Standard of Care is the care that would be given by similarly trained Physicians in similar clinical situations when faced with the same or similar medical conditions or circumstances. Care that meets the Standard of Care is reasonable and prudent, based on scientific principles and always takes into account what is in the best interest of the patient's health. This is particularly true when the patient is impaired by disease, situation, or substance that limits rational patient understanding or expression of care alternatives.

I have also reviewed the documents related to his detention and care in the Blackfeet Detention Center in Browning, Montana. These include:
    1. Numerous investigations by local, state, and federal agencies.
    2. The Report of Jail Operations Expert Jeff Eiser.
    3. The Glacier County Sherriff's Office report by David Spotted Eagle.

## SUMMARY OF FACTS

Willy Pepion was 22 years old when he presented to the ED of the Blackfeet Community Hospital (BCH) ED in Browning, Montana on May 10th, 2020, at 06:14. Although my notes contain a detailed timeline based on the existing records, I will only summarize the circumstances prior to his arrival at the Browning ED.
    1. Willy Pepion arrived with others to the house of Whitey Flammonds where his girlfriend, her father and mother were present. There were at least 7 individuals present intermittently at that location between the time of Willy Pepion's arrival and his departure with law enforcement.
    2. The most consistent story is that he got in a fight with Jazalynn Monroe, his girlfriend, and hit her in the mouth.
    3. Multiple other individuals engaged him in physical altercation and violent fighting in responses to his actions with fairly consistent stories of Willy Pepion being hit with a shovel, fists, and, after falling to the ground, being kicked by various individuals.
    4. Willy was briefly unconscious, either from his injuries or from intoxication and other substance use. Upon awakening, he remained agitated and uncooperative.
    5. Law Enforcement were called and before their arrival some individuals left the house site. The Law Enforcement personnel took Willey Pepion away under arrest but felt he needed to be medically cleared before being put in the "drunk tank" at the Blackfeet Correctional Center (BCC).
    6. This decision to have him medically evaluated at the local Hospital was based on the story given by others of the events, his appearance, his evidence for intoxication, his altered mental status, and BCC policies.

The BCH ED records document some limited information. There are contradictions in these records. The Chief Complaint is medical clearance and does not reflect what medical concerns by police would require his needing medical clearance before being taken to jail. It does note that he was unable to respond to a pain scale, although there are no comments as to a reason for his disability. In one place it notes that he was oriented to person, place, time and situation. This could only be true if he was communicating to the ED staff. It also documents he was able to say he had no allergies. It describes him as unruly and not cooperative. Hs vital signs are listed as 95.7, Pulse Rate 110, Respiratory Rate 22, O2 sat 98%, and BP 154/92. Later he is described as alert and oriented x 3 which would be time, place, and person, but not situation. The chart is marked as no active alcohol use although other records indicate that he had consumed a great deal of alcohol. (His blood alcohol was elevated on autopsy lab at 0.049 and using the Wisconsin DPS calculator that would give a blood alcohol level of 0.068 at the time of his being in the ED.) The physician notes no acute findings while agreeing that he is uncooperative and unruly. Particularly absent is any description of pupil size, eye movements, visual fields, face, head, neck, or shoulder trauma. However, based on later findings documented on autopsy, there were traumatic injuries in all these places. Palpation of the skull or neck was not recorded and assumedly not done. Most egregious was absence of any lab or imaging to look for other reasons for altered mental status. He is described as having active bleeding and fresh blood in the hair and on the face but no mention of this is made in the ED record.

Dr. Ortiz enters in the records that Willy Pepion has "no acute findings, and that he has examined the "prisoner" and finds him acceptable to be in the detention center. Dr. Ortiz documents that "he has no specific suggestions regarding his care for the conditions for which I have examined him,"

## PATHOPHYSIOLOGY

Blood alcohol level at the time of ED visit can be estimated using the Wisconsin Department of Public Safety information. Using data from the Autopsy—weight of 280 lbs, Time passage from ED visit to death of about 13 hours, reduction rate of alcohol done by subtracting 0.01% per 40 minute time passage, the calculations suggest he had a blood alcohol of 0.239 at the time prior to or at ED visit, and that he had consumed 12-14 drinks to achieve his blood level that would leave of 0.049 mg % in his blood at the time of death—this assumes each drink having 1.25 oz (small shot) of 80 proof liquor, or 12 oz ( 12 oz= 1 usual regular size can) of beer or 5 oz (small wine glass) of wine. Using this scenario, one would also predict that his blood alcohol level at various times while in custody—table below:

| Time | Location | ESTIMATE of blood alcohol level by calculation | Expected Mental state and impairment | Information from Records |
|---|---|---|---|---|
| 04:30 5-10-20 | At site of head injury | 0.239 (Normal is 0) | Stupor, loss of understanding, impaired sensations | Was described as impaired and would not communicate |
| 06:15 5-10-20 | ED | 0.220 | Angry, Boisterous, Over-expressive | Poor reaction time, s Staggering, slurred speech |
| 08:00 5-10-20 | BDC | 0.180 | Angry, Boisterous, Emotional Swings | Non-cooperative during booking attempt |
| Noon 5-10-20 | BDC | 0.120 | Blunted Feelings, Extroversion | Not awakening to attempt to serve lunch |
| 14:00 5-10-20 | BDC | 0.090 | Blunted Feelings | Impaired Reflexes and Reasoning, not seen to be moving |
| 16:45 5-10-20 | BDC | 0.060 | Relaxation, Sense of Well Being, Loss of inhibitions Impaired Concentration | Moving Left arm and Heaving hard |
| 17:02 5-10-20 | BDC | 0.049 | Impaired judgement | No movement, no visible breathing |

Although I don't have information how much, what, or when he drank, but that should not interfere with what his behavior would be expected to be like based on his alcohol content. The table below matches range of alcohol with behavior and expected impairment. As you can see, based on the calculated blood level at the time of ED presentation, his behavior and impairment should likely be as follows for a 0.069 blood level of alcohol: Based on this, his behavior and impairment as described should not have been explained by alcohol alone.

The full range on the table is included below:

4

### Progressive Effects of Alcohol

| BAC | Behavior | Impairment |
|---|---|---|
| .01–.06 | • Relaxation<br>• Sense of Well-being<br>• Loss of Inhibition<br>• Lowered Alertness<br>• Joyous | • Thought<br>• Judgment<br>• Coordination<br>• Concentration |
| .06–.10 | • Blunted Feelings<br>• Disinhibition<br>• Extroversion<br>• Impaired Sexual Pleasure | • Reflexes Impaired<br>• Reasoning<br>• Depth Perception<br>• Distance Acuity<br>• Peripheral Vision<br>• Glare Recovery |
| .11–.20 | • Over-Expression<br>• Emotional Swings<br>• Angry or Sad<br>• Boisterous | • Reaction Time<br>• Gross Motor Control<br>• Staggering<br>• Slurred Speech |
| .21–.29 | • Stupor<br>• Lose Understanding<br>• Impaired Sensations | • Severe Motor Impairment<br>• Loss of Consciousness<br>• Memory Blackout |
| .30–.39 | • Severe Depression<br>• Unconsciousness<br>• Death Possible | • Bladder Function<br>• Breathing<br>• Heart Rate |
| >.40 | • Unconsciousness<br>• Death | • Breathing<br>• Heart Rate |

**ED visit**--Patients with evidence for a head injury simultaneous with ingestion of mind-altering substances are common in the environment of Emergency Department patients. This was true prior to the advent of modern imaging technology but ease of the correct diagnosis to explain altered mental status has dramatically improved with advent of Computerized Axial Tomography (CT or initially CAT) scans. CT scans can easily, accurately and rapidly exclude intra-cranial bleeds as a cause of Mental Status impairment in an intoxicated patient. A further explanation of CT scans is included in a segment borrowed from Wikipedia:

A **computed tomography scan** (usually abbreviated to **CT scan**; formerly called **computed axial tomography scan** or **CAT scan**) is a medical imaging technique used to obtain detailed internal images of the body...

CT scanners use a rotating X-ray tube and a row of detectors placed in a gantry to measure X-ray attenuations by different tissues inside the body. The multiple X-ray measurements taken from different angles are then processed on a computer using tomographic reconstruction algorithms to produce tomographic (cross-sectional) images (virtual "slices") of a body...

Since its development in the 1970s, CT scanning has proven to be a versatile imaging technique. While CT is most prominently used in medical diagnosis, it can also be used to form images of non-living objects. The 1979 Nobel Prize in Physiology or Medicine was awarded jointly to South African-American physicist Allan MacLeod Cormack and British electrical engineer Godfrey Hounsfield "for the development of computer-assisted tomography".[4]

The Blackfeet Community Hospital website notes that CT scanning is a service available to patients at the Browning, Montana hospital as noted on their website:

" First opened in Browning, Montana in1937, the Blackfeet Community Hospital has since been transformed into an expansive modern day 110,000 square foot 28 bed comprehensive health care facility complete with a 64 slice state of art computer tomography (CT) unit within a fully digitized radiology and lab service department."

Subdural Hematomas occur when small veins in the subdural space begin to leak blood which accumulates in this space. Because the human brain floats in a fluid filled compartment (the bony skull) and is tethered in part by these veins, rapid acceleration deceleration events can trigger injury to these veins without violation of the integrity of the skull bone. However, in this case, the skull bone itself was shattered by external force (likely the described "hitting with a shovel") both in the temporal-parietal location and the occipital location.

A description of the injuries is noted in the Autopsy report on pages 4 and 5:

EVIDENCE OF INJURY

1. Within the left temporal scalp is an area of abrasion.
2. Within the left temporalis muscles is a large area of intramuscular hemorrhage measuring approximately 8 x 12 cm in greatest dimension. The overlying skin is intact
3. Within the squamous portion of the left temporal bone are a series of comminuted fractures which coalesce at a central point.
4. Within the left occiput are three linear fractures which coalesce at the posterior petrous temporal bone

4. The left temporal and parietal cortex are compressed due to subdural hematoma. Associated with this is left to right midline shift with early cingulate gyrus herniation. The lateral ventricles are also compressed. Right temporal and parietal regions of the brain contain flattening of the gyri and narrowing of the sulci. Coning of both cerebellar tonsils are present, the left greater than the right, without gross necrosis.

5. Posterior dissection of the back reveals subcutaneous hemorrhage over both posterior shoulders.

Autopsy Microscopic examination of the Dura shows:

Dura:           Subacute hemorrhage with focally dense infiltration with
                neutrophils, early fibroblast infiltration: age approximately 2-4 days

6

Had Patient Pepion had a CT scan of the head utilizing the CT scanner at BCH ED, the findings of brain injury would have been obvious, and these findings, if treated within the Standards of Care (SOC) would have resulted in relief of hematoma pressure, lessening or most likely prevention of the brain injury, and survival of the patient, more likely than not, without discernable disability.

**SOC violation and Causation 1. It is my opinion that the failure to do a CT scan of the head, given the information from available history and supported by the expected findings on an appropriate physical examination, was a causative factor in the patient's progression of a treatable injury that led to his death.**

Subdural Hematomas are a progressive illness leading to eventual death most often by shifting the brain substance from symmetrical to asymmetrical locations in the brain. When this occurs from left to right it is often called a "midline shift." When it occurs from front to back it most often causes deformity of the Cerebellum to cause lower back part of the brain to push through a small opening and put pressure on the part of the brain that controls respiration. This is often called a "Cerebellar tonsil herniation through the Foramen Magnum" and results in a cessation of respiratory function and death. However, this set of changes can vary in its rapidity of onset and there is almost always a period of time in which an evacuation of the subdural hematoma or treatment of the intracranial pressure medically can prevent or delay the further progression of brain "shifting."



**Figure 16.** Drawings show tonsillar hernia. **(a)** Sagittal view demonstrates tonsils extending below the foramen magnum (curved arrow), brainstem compression against the clivus (straight white arrow), obliteration of the medullary cistern (black arrow), and obstructive hydrocephalus (∗). **(b)** Axial view at the level of the foramen magnum. The displaced tonsils (∗) cause obliteration of the surrounding CSF, anterior displacement of the medulla (arrow), and compression of the spinal (black arrowhead) and vertebral (white arrowhead) arteries.

This illustration is from "Types of Cerebral Herniation …."

7

This illustration above shows is the likely cause of death of Patient Pepion and is described by the pathologist as "coning" of the cerebellum tonsils and herniation of the cone of cerebellum tissue onto the brainstem and medulla of the brain. This causes a respiratory arrest and rapid death. Once occurring, rescue is not possible.

The image below is an illustration of the anatomy associated with a subdural hematoma. Important factors to appreciate in this illustration are:
1. Bleeding is from the low-pressure blood vessels that surround and tether the brains position inside the skull.
2. The brain substance compression occurs gradually and overtime, giving medical professionals the opportunity to arrange transfer or local intervention (usually a surgery called a craniotomy) for intervention and halting the progression of injury or even allowing reversal of brain deformity to normal anatomic anatomical position.
3. There is great importance of not missing this diagnosis as it can progress as illustrated in further images.



Instructional Tutorial VideoCanadaQBank.comQBanks for AMC Exams, MCCEE, MCCQE & USMLEURL: http://youtu.be/jl_0hgn3Y-w

The image below shows a CT scan typical appearance from an acute subdural hematoma. This image is not from Patient Pepion and shown only for illustration of how distinct the CT findings are. The black crescent shaped area in the right upper part of the image is the blood accumulation around the brain within the skull:

8

This image shows the typical midline shift of the brain—in this case, from Right to Left of the image. This shift is from the presence of the of the blood external to the brain but internal to the white appearing skull bone, and the changes of brain contour below the hematoma as compression takes place with loss of the "hills and valleys" still present on the image left side --seen on the other side of the brain. Also note is the compression of the internal black space of the brain "ventricle" which on the right side of the image is compressed and collapsed but remains inflated on the left side of the image.

Careful readers of the autopsy report will notice that mention is made of R temporal and parietal parts of the brain with flattening of the gyri and narrowing of the sulci. This may first appear to suggest a loss of orientation of "right and left" in the author's report. However, injury on the opposite side of the brain from the trauma is the rule rather than the exception and described below:

*Contrecoup injuries classically occur when the moving head (brain) strikes a stationary object; whereas, a coup injury is associated with a moving object impacting a stationary head. Classic evidence of both coup and contrecoup injury is an intracerebral hemorrhage or contusion in a focal area noted on computed tomographic (CT) scan or magnetic resonance imaging (MRI). Contrecoup lesions arise from forces within the intracranial cavity, which are not directly related to the site of the focal blow but instead is related to stress on the brain and its structure caused by the force of the blow on an already moving head. After the head receives an impact, the floating brain rebounds in the opposite direction.*

**Contrecoup Brain Injury**   William N. Payne; Orlando De Jesus; Andrew N. Payne. Last Update: May 29, 2022.

Thus, this is not a typographical error but a correct orientation of brain injury opposite from the side of the external blow.

## MEDICAL STANDARDS OF CARE THAT APPLY IN THIS SITUATION

### 1. Substance misuse and clinical conditions that mimic intoxication--management in ED.

SOC is to recognize that many medical conditions can occur in patients that have misused substances or have taken intoxicants such as alcohol. One of the first signs of severe head injury is agitation or confusion, and without further lab or imaging, it is not possible to determine that an intoxicated person or simply a person with

9

elevated alcohol levels or with positive urine drug testing has mental status changes because of the alcohol or substance use. The SOC requires a first consideration of patient safety as the highest priority, and this requires a trauma work-up. In cases of a history of head trauma, this would include a CT scan. In cases of alcohol ingestion, a blood alcohol level is necessary. (Reverse calculation of Patient Pepion shows that his blood level of alcohol was not high enough at the time of his presentation to explain much of his behavior or impairment.) Patient agitation cannot be allowed to unduly delay or prevent an appropriate work-up. Indeed, because of agitation, patient non-cooperation, or compromise in neurologic exam clinical testing that requires patient cooperation, it is imperative to get objective evidence by lab and imaging studies confirm or exclude a diagnosis.

The SOC required head imaging in this situation before this patient was cleared for jail confinement.

**2. Charting of objective signs of neurologic function are a requirement of a situation of in which Mental Status is altered and for which head injury has not been eliminated as a cause.**

SOC requires that objective neurologic sigs be recorded for patients in the ED with a risk of having a head injury. This is for 2 reasons. First, the diagnosis may be made by neurologic abnormalities noticed of first examination. (For instance, a non-reactive dilated pupil on the side of a head injury is a fairly reliable sign of a subdural hematoma on that side.) Second, progression may be noticed that triggers interventions and this may be the only available data available to other providers if it was charted at the time and in completeness at each time of the medical professional's interaction with the patient.

*The benefit or serial observation of neurologic functions and/or signs of dysfunction may be essential to both making the diagnosis or in following the course of the etiology of the Mental Status change. For instance, in what seems to be a minimal brain bleed, the presence of deterioration of the Glasgow Coma Score (GCS) of 2 points between the time of injury and time of presentation to the ED are used as a basis for deciding to intervene surgically in a brain injured patient. (* **Glasgow Coma Scale**)

Shobhit Jain; Lindsay M. Iver Last Update: June 21, 2022. National Library of Medicine.

Thus, a meticulous and complete recording of neurologic signs is a SOC in the management of patients, and even those who might be candidates for release must have neurological signs recorded in the record, even if normal and not helpful for making a diagnosis so as to be available for other clinicians to compare future or the progression of such findings.

**3. Since jail personnel are not trained in management or monitoring of potential medical conditions, patient safety is compromised by putting patients in jail while they still may have significant but undiagnosed medical conditions, particularly if they are impaired by self-recognition of medical illness. This is a violation of SOC.**

The correct location for a patient with altered mental status whose findings may be explained by substance use but also may have trauma induced brain dysfunction is hospitalization and management by medical professionals. Depending on the situation, it may be appropriate to transfer to hospitals with surgical intervention option inhouse. Doing so would allow more rapid intervention in urgent medical situations caused by deterioration of patients with a confusing or uncertain diagnostic challenge. Telephone conversations with specialist physicians may be appropriate to help the treating physician with his/her decision making.

4. If granting Medical Clearance for intoxicate patients before jail confinement, the SOC would require the Physician doing so to outline the expected course of recovery, such as "Jail personnel should see progressive improvement in signs of intoxication with time, and deterioration of function should result in urgent return to the ED or other healthcare intervention." A failure to outline the expected course of a patient based on the working diagnosis that allowed proceeding to jail confinement, and outlining the likely findings that would cause a need for further medical evaluation is a part of care required by the SOC, not only for jail Medical Clearance but for any caregiver of a patient being discharged from the ED. Failure to do this violates the SOC.

## SPECIFIC STANDARD OF CARE (SOC) VIOLATIONS

1. Dr. Ortiz failed to consider the diagnosis of Traumatic Head Injury as an explanation of signs or symptoms of this patient's agitation and failed to order appropriate testing or make arrangement for appropriate testing elsewhere as required by the SOC

1. Causation. Because of this failure, the opportunity for intervention in the course of the patient's expanding subdural hematoma was lost and the patient died. It is more likely than not, a 22 year old man with a subdural hematoma, if operated on before terminal respiratory arrest from brain herniation would have had an 80+ percent of survival.

2. Dr. Ortiz failed to either do, or record, or both, a detailed neurologic examination which would have, in this case, included GCS as required by the SOC. By this failure, the opportunity to first make a diagnosis of a significant traumatic brain injury which, in fact, was a treatable subdural hematoma was lost. Secondly, his failure to do or record or both the neurologic findings would have prevented subsequent examiners of being able to compare parameters and adequately record the course of the illness.

2 Causation. Had Dr. Ortiz followed the SOC and done and recorded a neurologic exam and had Patient Pepion been given care consistent with the SOC, more likely than not, Dr. Ortiz or subsequent treaters would have been able to diagnosis the localized intracranial subdural hematoma and intervened in a timely manner to prevent the patient's death.

3. Dr. Ortiz cleared the patient for being placed in jail. This violated the SOC and was in negligent disregard for the patient's safety. A traumatic head injury had in no way been excluded as a cause of some or all of the patient's mental status changes. This clearance should have never been given without having done further testing. Even if there had not been a traumatic head injury and a subdural hematoma, having no objective measurement of a blood alcohol, no measurement of his blood sugar or acid base status was not care required by the SOC.

3 Causation. Had the SOC been followed, the patient would have, more likely than not, either been admitted to the hospital at Browning where trained personnel would have seen deterioration of his GCS and transferred to the hospital with neurosurgical specialty available. More likely, he would have been directly admitted to a hospital with neurosurgical services. More likely than not, had the hospital he was admitted in followed the SOC, a successful timely surgical intervention would have occurred and prevented his death.

4. In this case, granting a Medical Clearance without any specific additional instructions for what to expect as in a course of recovery for the patient, and specifying what events, if occurring, would require

11

a return to a health care institution for evaluation was a violation of the SOC. Dr. Ortiz specifically notes that he has no specific suggestions for the care of this patient after leaving the ED and going to jail. This failure to give specific suggestions is a violation of the SOC.

4 Causation. Correct specific suggestions if followed by the Jail Personnel would have resulted in the patient being re-evaluated by a healthcare setting as the patient was noted to deteriorate. More likely than not, had the SOC been followed with this re-evaluation, a diagnosis of a subdural would have been made, and a live-saving plan of intervention followed. More likely than not, this would have prevented the death of Patient Pepion.

5. EMTALA not only establishes a SOC for an ED in the USA, but requires, as a matter of Federal Law, that an Emergency Department do a Medical Screening Exam (MSE) which must be done by a person fitting the definition of being Qualified Medical Personnel, sufficient to determine the presence of absence of an emergency medical condition. This applies to any patient presenting to any Emergency Department for any condition. It is my opinion based on the patient's presentation history, his documented condition, and, taking into account the medical records of the ED, and the autopsy findings, that the encounter did not include an examination sufficient to meet the exclusion of conditions of a medical emergency of the EMTALA MSE for this patient. There is no charting associated with the exam or record of it being done. Specifically, a CT of the head and a sufficient neurologic exam was not done prior to admission, and in this case.  This would have been requirements to meet EMTALA conditions for a MSE. This is a violation of federal law and the SOC.

5. causation. Had the MSE been done as required by EMTALA and SOC, the patient would not have been sent to the correctional facility and would have not been discharged from the ED except for admission to a inpatient setting. More likely than not, he would have either been admitted locally or have been transferred to a hospital with neurosurgical capabilities for definitive surgery.

6. Law enforcement personnel made a decision to arrest Willy Pepion. They did bring him back to be incarcerated after the ED visit. However, it is clear from videos and records that they did not meet the expected frequency of welfare checks of the inmate required by their own policies. Nor did they take note of his development of changed deterioration of mental function between breakfast and lunch and continued deterioration of mental function. Going from alert enough to eat breakfast to sleepy enough to not wake up for lunch is a significant change in status. Also, there is evidence that the BCC staff falsified records of their monitoring of his condition.

5 Causation. Had they monitored the patient as was in their facility policy, done a medical screening on admission, and followed the Jail standards for monitoring and care of this prisoner, more likely than not, they would have documented his continuing worsening of mental function. More likely than not, they would have returned him to a health care facility for further evaluation either in response to his worsening condition or in response to his requests to be taken to a health care facility. Had this been done and the SOC followed by the health care professionals, he would have been diagnosed with skull fractures and intracranial head bleeding. Eventually a diagnosis of a subdural hematoma would have occurred and a plan for his care developed. An intervention would have occurred either locally or at a higher-level facility after transfer. More likely than not, utilizing temporizing measures to relieve intracranial pressure, he would have not died from complications of the subdural hematoma.

## CONDENSED SUMMARY

1. Had the patient been properly evaluated within the SOC, the skull fractures would have been found with palpation and routine skull x-rays.
2. Based on history and altered mental status, regardless of his intoxicated state, SOC would have required A CT scan before transfer to jail.
3. His deterioration in jail should have mandated return to a health care facility.
4. His request to be taken back to the hospital should have been honored.
5. With a high degree of certainty, discovery of the subdural hemorrhage at any point before 3 hours of his death should have allowed adequate time for lifesaving intervention to prevent death from a subdural hemorrhage. More likely than not, even discovery of the subdural 1 hour before death should have allowed time at least a 51% likelihood that appropriate lifesaving intervention could have been accomplished.
6. Deviations from the Standard of Care by medical professionals prevented the discovery of his head injury and subdural bleeding. The absence of this discovery and the failure to make that diagnosis directly resulted his death.
7. Deviations from Jail Protocol, falsification of records and failure to honor requests for return to the hospital all contributed to the denial of opportunity for re-evaluation of his condition by health care professionals. Had he been treated within the SOC and had a CT scan of the head, a subdural hematoma and 2 separate trauma induced skull fractures would have been discovered and he would have been expediently transferred to a level II trauma center, had intervention to decompress and remove the subdural hematoma and avoided both death and significant brain injury.

More likely than not, both palpation and plain skull x-rays in this case would have discovered the fractures and this would have resulted, even without a CT scan, transfer to a secondary trauma center for intervention and he would have survived and likely returned to his previous level of function.

I reserve the right to make modifications as further information becomes available. This completes my medical report. I trust you will let me know if you have any concerns or if there are questions not addressed in this report. I anticipate the attachments of a CV, a list of publications mentioned in the report, a timeline of events, and my testimonial history to this report.

Sincerely

*T. Laurence Huffman MD*

T. Laurence Huffman M.D.